# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| **THE UNITED STATES OF AMERICA, and THE STATE OF NEBRASKA,** | **CASE NO. 8:11CV274** |
| **Plaintiffs,** | |
| **vs.** | **MEMORANDUM AND ORDER** |
| **STABL, INC. (f/k/a Nebraska By-Products, Inc.),** | |
| **Defendant.** | |

This matter is before the Court on the Plaintiffs' Motion for Partial Summary Judgment on the Issue of Liability ("Summary Judgment Motion") (Filing No. 59), as well as the Motion to Strike (the "Original Motion to Strike") (Filing No. 73) and Supplemental Motion to Strike (Filing No. 87) filed by Defendant Stabl, Inc. ("Stabl"), seeking to strike (a) the Plaintiffs' Motion for Summary Judgment; (b) the Plaintiffs' Reply Brief Supporting Their Summary Judgment Motion ("Reply Brief") (Filing No. 68); and certain exhibits the Plaintiffs have offered to support their Reply Brief (*see* Filing No. Filing Nos. 69 & 70). Although, in its Original Motion to Strike, Stabl sought to strike all of the exhibits the Plaintiffs offered in support of their Reply Brief, in the Supplemental Motion to Strike, Stabl only seeks to strike Exhibit Nos. 24, 26, 30, 31, 32, 36, and 37. For the reasons stated below, the Original Motion to Strike will be denied as moot, the Supplemental Motion to Strike will be granted in part, and the Summary Judgment Motion will be granted in part.

## PROCEDURAL BACKGROUND

The Plaintiffs filed this action on August 10, 2011, alleging that Stabl violated the Clean Water Act ("CWA"), 33 U.S.C. §§ 1311 and 1317, and/or the Nebraska

Environmental Protection Act ("NEPA"), Neb. Rev. Stat. § 81-1502, *et seq.*, by (1) causing or contributing to the City of Lexington violating its National Pollution Discharge Elimination System ("NPDES") permit, (2) discharging pollutants in excess of the limits permitted by its pretreatment permit issued by the State of Nebraska, (3) failing to sample for pollutants it was required to sample pursuant to its pretreatment permit, and (4) failing properly to abandon three wastewater lagoons.  (Compl., Filing No. 1.)

On January 31, 2013, the Plaintiffs filed their Summary Judgment Motion, along with a supporting brief and index of evidence (Filing Nos. 60, 61.)  The Plaintiffs' support brief contains a statement of material facts with pinpoint references to exhibits in the record that the Plaintiffs contend support their statement of material facts.  On March 1, 2013, Stabl filed a brief and index of evidence in opposition to the Plaintiffs' Summary Judgment Motion.  (Filing Nos. 64, 65.)  Stabl addressed the Plaintiffs' statement of facts, contending only that that the Plaintiffs' exhibits either are inadmissible or do not support the factual allegations for which they were cited.  Stabl's opposition brief also presents in four numbered paragraphs a separate statement of facts.

On March 19, 2013, the Plaintiffs filed their Reply Brief and an index of evidence in support of their Summary Judgment Motion.  (Filing Nos. 68, 69, 70.)  The Plaintiffs' reply index indicated that the Plaintiffs were submitting as an attachment the "Declaration of Katherine A. Loyd, with attached Exhibits 24-37," although the Loyd declaration was not actually attached to the reply index.  (Filing No. 69.)  In the Reply Brief, the Plaintiffs responded to Stabl's separate statement of facts, and addressed the evidentiary objections presented in Stabl's opposition brief.

On March 26, 2013, Stabl filed its Original Motion to Strike, asserting that the Plaintiffs' Summary Judgment Motion, the Reply Brief, and the exhibits offered in support of the Reply Brief should be stricken because the Plaintiffs failed to file a declaration to provide the foundation for the exhibits contained in the reply index.  Stabl also sought to strike certain other exhibits, contending that they contained previously undisclosed expert opinions.

On March 27, 2013, the Plaintiffs filed the omitted declaration (Filing No. 76-1) along with an explanation indicating that the omission was inadvertent and that steps were taken to correct the error as soon as it was discovered.  (*See* Filing No. 76.)  On April 9, 2013, the Plaintiffs filed a brief in opposition to Stabl's Original Motion to Strike. (Filing No. 85.)  On April 10, 2013, Stabl filed the Supplemental Motion to Strike, still seeking to strike the Plaintiffs' Reply Brief and Summary Judgment Motion in their entirety, but now in light of the Plaintiffs having corrected its error in failing to file Loyd's declaration, only seeking to strike certain exhibits the Plaintiffs offered in support of their Reply Brief: exhibits 24, 26, 30, 31, 32, 36, and 37.  In light of Stabl's Supplemental Motion to Strike, Stabl's Original Motion to Strike will be denied as moot.

## EVIDENTIARY OBJECTIONS

Instead of pointing to evidence to rebut the Plaintiffs' evidence and to show material questions of fact exist, Stabl opposes the Summary Judgment Motion by attacking the evidence to which the Plaintiffs have pointed to support the motion, both in its brief in opposition to the Plaintiffs' Summary Judgment Motion and in its Supplemental Motion to Strike.  The Court will address Stabl's evidentiary objections before turning to the Summary Judgment Motion and the parties' statements of fact.

## I. Objections in Stabl's Opposition to the Summary Judgment Motion

### A.     The Compliance Plan, Ex. 3 (Filing No. 61-3)

Stabl contends that exhibit 3 (Filing No. 61-3), titled "Compliance Plan for Nebraska By-Products, Inc." (the "Compliance Plan"), is inadmissible hearsay because, although it was submitted to the United States Environmental Protection Agency ("EPA") on Stabl's behalf, it was prepared by a consultant who was not an officer, director, or owner of Stabl.  (Def.'s Br., Filing No. 64 at 2-3.)  The Plaintiffs, however, have pointed to evidence indicating that the consultant prepared the Compliance Plan for Stabl as part of a work proposal to which Stabl agreed (Dep. of Thomas T. Satchell, Filing No. 70-5, 29:19-21, 30:11-14, 31:20-32:1); that Stabl's plant manager, Jason Fagot, informed the EPA that Stabl retained the consultant to prepare the Compliance Plan (Filing No. 70-10); and that the consultant reviewed the Compliance Plan with Fagot before submitting it to the EPA (Filing No. 70-5 at 37:18-19, 82:6-20; Filing No. 70-11); and none of the evidence to which the parties have pointed indicates Stabl had any objections to the Compliance Plan or to submitting it to the EPA to satisfy its obligations under the CWA.  Thus, the Compliance Plan is not hearsay, *see* Fed. R. Evid. 801(d)(2), and Stabl's hearsay objection will be overruled.

### B.     The First Declaration of the Plaintiffs' Expert, Ex. 5 (Filing No. 61-5)

Stabl contends certain statements made in the first declaration of Plaintiffs' expert, Mark J. Klingenstein, P.E. (Filing No. 61-5), are inadmissible because Klingenstein is not qualified to be an expert with respect to wastewater collection and treatment, and because certain statements were not designated as separate "opinions" in his report.  Stabl also argues that "[t]o the extent his statements are simple

4

reiterations of other documents, they are inadmissible hearsay," and that Klingenstein's "'summary' chart is totally unsubstantiated, and the same has no foundational basis or reliability whatsoever."  (Filing No. 64 at 3 ¶ 10, 5-9 ¶ 15 (citing Fed. R. Evid. 1006).)

The Plaintiffs contend that Klingenstein is qualified to speak as an expert on wastewater issues because he has a B.S. in civil engineering, a master of engineering in civil engineering, both requiring him to attend numerous classes in chemistry, biology, water/wastewater treatment processes; he is a licensed professional engineer in three states; and for at least thirty years, he has focused much of his professional career on municipal wastewater treatment.  (*See* Supp. Decl. of Mark J. Klingenstein, P.E., Filing No. 70-6 at ¶¶ 2-12.)[1]   The Plaintiffs also argue Klingenstein merely summarizes discharge monitoring reports ("DMRs"), which are admissible to prove Stabl's liability and have been made part of the record (*see* Filing Nos. 61-8, 69-3 through 69-8, 70-1, 70-2), making the "summary charts" unnecessary for to prove Stabl's liability.

Having reviewed the record and considered the parties arguments, the Court finds, pursuant to Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael,* 526 U.S. 137 (1999), that Klingenstein is qualified as an expert with respect to wastewater treatment and collection issues. Stabl's objections to Klingenstein's qualifications will be overruled.   Furthermore the DMRs have been made a part of the record and, as will be explained below, the DMRs are admissible to prove Stabl's liability, and Stabl does not dispute that the tables

---

[1]  The Court notes that Stabl objects to Klingenstein's supplemental declaration in its Supplemental Motion to Strike.  The Court will address Stabl's objection to Klingenstein's supplemental declaration when it addresses the Supplemental Motion to Strike, below.

accurately summarize the information reflected in the DMRs.    Therefore, Stabl's objections to Klingenstein's report will be overruled.

### C.    Preliminary Engineering Report, Ex. 6 (Filing No. 61-6)

Stabl contends that the "Preliminary Engineering Report" (the "Report") (Filing No. 61-6) "is completely hearsay; it is not a sworn statement; it [is] a document not verified by its authors and indeed it[s] authors have not been designated as experts by the Plaintiffs or even identified; and it is a document with no foundational or reliable support whatsoever."  (Filing No. 64 at CM/ECF p. 5 ¶ 14.)  The Plaintiffs argue that the Report is admissible under Fed. R. Evid. 803(6).[2]

The Plaintiffs have pointed to evidence indicating that the EPA and the Nebraska Department of Environmental Quality ("NDEQ") received the Report, which was kept in the EPA's file for the Facility as part of the EPA's regularly conducted activities (Decl. of Paul Marshall, P.E., Filing No. 70-7 ¶¶ 1, 6); and that Lexington hired the Report's authors to prepare the Report for a consulting project and received the Report from the authors at or near the time of the project, maintained the Report in its files in the regular

---

[2]

A record of an act, event, condition, opinion, or diagnosis if:

  **(A)** the record was made at or near the time by--or from information transmitted by-- someone with knowledge;

  **(B)** the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

  **(C)** making the record was a regular practice of that activity;

  **(D)** all these conditions are shown by the testimony of the custodian or another qualified witness . . . ; and

  **(E)** neither the source of information nor the method or circumstances of preparation indicate a lack of trustworthiness.

Fed. R. Evid. 803(6).

course of its business, and relied on its accuracy in designing an industrial wastewater pretreatment facility for Lexington.  (*Id.* at ¶ 6; Decl. of Joe Pepplitsch, Filing No. 70-8.)[3] Although the Plaintiffs have not produced an author's statement verifying the Report, the Plaintiffs were not required to do so under the present circumstances.[4]  Therefore, Stabl's objection to the Report will be overruled.[5]

### D.   Stabl's Discharge Monitoring Reports, Ex. 8 (Filing No. 61-8)

Stabl argues that its "Discharge Monitoring Reports" ("DMRs") (Filing No. 61-8) are inadmissible because they are "hearsay and contain hearsay within hearsay" and because they are unreliable (Filing No. 64 at 12-13 ¶ 30, 6-9 ¶ 15, 10 ¶ 19, 12 ¶ 30). Stabl notes Lexington has always performed the testing reflected in its DMRs.  (Filing No. 65-6.)  The Plaintiffs contend DMRs are admissible as a matter of law, and that the DMRs at issue in this case are accurate and reliable.

Only certain individuals are authorized under the Clean Water Act to sign an application for a NPDES permit.  *See* 40 C.F.R. §§ 122.22(a), 123.25(a)(5).  Once a

---

[3]  The Court notes that Stabl objects to Marshall's and Pepplitsch's declarations in its Supplemental Motion to Strike.  The Court will address Stabl's objections to these declarations when it addresses the Supplemental Motion to Strike, below.

[4]  *See Brawner v. Allstate Indem. Co.*, 591 F.3d 984, 987 (8th Cir. 2010):

Several other courts have held that a record created by a third party and integrated into another entity's records is admissible as the record of the custodian entity, so long as the custodian entity relied upon the accuracy of the record and the other requirements of Rule 803(6) are satisfied. *See United States v. Adefehinti*, 510 F.3d 319, 325-26 (D.C. Cir. 2007) ("[S]everal courts have found that a record of which a firm takes custody is thereby 'made' by the firm within the meaning of the rule...."); *Air Land Forwarders, Inc. v. United States*, 172 F.3d 1338, 1342-44 (Fed. Cir. 1999); *United States v. Childs*, 5 F.3d 1328, 1333-34 (9th Cir. 1993); *United States v. Duncan*, 919 F.2d 981, 986-87 (5th Cir. 1990). We agree with these courts and hold that the district court did not abuse its discretion by concluding that Allstate was not required to produce an individual from the entity that prepared the record to establish a foundation.

[5]  The Court notes that Stabl objects to the Report on another basis in its Supplemental Motion to Strike, when objecting to Pepplitsch's declaration.  The Court will address that alternative basis for objecting to the Report, below, when it addresses the Supplemental Motion to Strike.

NPDES permit has been obtained, the Clean Water Act requires the NPDES permit holder to maintain monitoring equipment, sample effluent, and to report results through DMRs and notices of non-compliance to the authority that issued the NPDES permit. *See* 33 U.S.C. § 1318(a), (c); 40 C.F.R. §§ 122.41, 122.48, 123.25.  Furthermore, when submitting a DMR and notice of non-compliance to the proper authority, the individual who signed the NPDES permit is required to certify "under penalty of law" that the DMR and/or notice of non-compliance was prepared under his or her "direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted," that "[b]ased on [his or her] inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of [his or her] knowledge and belief, true, accurate, and complete," and that he or she is "aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations."  40 C.F.R. § 122.22(d).

Thus, "a permittee's DMRs constitute admissions regarding the levels of effluents that the permittee has discharged" and "may be used to establish the permittee's liability under the Act by showing that the permittee has exceeded its NPDES permit limitations."  *United States v. CPS Chem. Co., Inc.*, 779 F. Supp. 437, 442 (E.D. Ark. 1991).  It is possible for a defendant to avoid liability at the summary judgment stage based on allegedly inaccurate data in DMRs.  *Pub. Interest Research Grp. of N.J v. Yates Indus., Inc.*, 757 F. Supp. 438, 447 (D.N.J. 1991).  To do so, however, the defendant "may not rely on unsupported 'speculation' of measurement error."  *Id.* Instead, the defendant bears the "heavy burden" of "present[ing] direct evidence of

8

reporting inaccuracies in order to defeat plaintiffs' motion"; it "must prove that there were errors in the actual tests performed which showed a permit violation[ ]."   *Id.* (internal quotation marks omitted).

Even though Lexington performed the testing for the Facility, Stabl's plant manager signed the DMRs next to certification language identical to that set forth in 40 C.F.R. § 122.22, and Stabl has failed to point to evidence sufficient to satisfy its "heavy burden" of showing that reporting inaccuracies exist in the DMRs.[6]   Therefore, Stabl's objection to its own DMRs will be overruled.

### E.      Deposition Testimony, Exs. 12 & 13

Stabl objects to certain excerpts of the deposition testimony of Fagot (*see* Filing No. 61-11) and the deposition testimony of the manager of Lexington's POTW, Jess Bliven (*see* Filing No. 61-12).   (Filing No. 64 at CM/ECF p. 14-15 ¶¶ 36-38.)   The Court notes Stabl's objections, and will consider the deposition testimony of Fagot and Bliven when ruling on the Plaintiffs' Summary Judgment only to the extent it is necessary and only to the extent the testimony is admissible.

### F.      EPA Inspection Report & Compliance Order, Exs. 15 & 16 (Filing Nos. 61-15, 61-16)

Stabl contends that the EPA's report of its February 2008 inspection of the Facility (the "EPA Inspection Report") (Filing No. 61-15) and the EPA's findings of violation and order for compliance (the "EPA Compliance Order") (Filing No. 61-16) are inadmissible because they are "hearsay and contain[ ] hearsay within hearsay," and

---

[6] The Court notes that the document evidencing Lexington and Stabl's agreement that Lexington would provide the testing for the Facility states that Lexington's "laboratory has been found proficient, and is able to perform the following tests required by [Stabl] in accordance with 40 C.F.R. 136 and Standard Methods."   (Filing No. 65-6.)

because foundation is lacking.  (Filing No. 64 at 16 ¶¶ 44, 46.)  The Plaintiffs argue that

the EPA Inspection Report and EPA Compliance Order are admissible under Fed. R.

Evid. 803(8) and 803(6).  (Pls.' Br., Filing No. 68 at 10.)

Fed. R. Evid. 803(8) excepts from the rule against hearsay "[a] record or

statement of a public office if . . . it sets out . . . a matter observed while under a legal

duty to report," or "in a civil case . . . factual findings from a legally authorized

investigation," and "neither the source of information nor other circumstances indicate a

lack of trustworthiness."  *Id.* at 803(8)(A)(ii) & (iii), (B).  "Rule 803(8) indicates that public

records are admissible unless the sources of information or other circumstances

indicate lack of trustworthiness."  *Amtrust Inc. v. Larson*, 388 F.3d 594, 599 (8th Cir.

2004) (internal quotation marks omitted).  In other words, "[t]he rule assumes

admissibility in the first instance but with ample provision for escape if sufficient

negative factors are present."  *Id.*  Therefore, generally "[n]o foundational testimony is

required in order to admit evidence under Rule 803(8)," *United States v. Vidacak*, 553

F.3d 344, 351 (4th Cir. 2009), and "[t]he burden is on the party opposing admission to

prove the report's untrustworthiness."  *Amtrust Inc.*, 388 F.3d at 599.  Furthermore, the

Eighth Circuit has stated that, under Rule 803(8), "EPA reports are generally

admissible" as long as they "survive a trustworthiness inquiry."  *O'Dell v. Hercules, Inc.*,

904 F.2d 1194, 1206 (8th Cir. 1990).

It appears that the EPA Inspection Report sets out matters observed while under

a legal duty to report, and that the EPA Compliance Order sets out factual findings from

a legally authorized investigation, and Stabl has not pointed to any evidence suggesting

to the contrary.  As the party opposing the introduction of these exhibits, Stabl has failed

10

to point to negative factors sufficient to cause the Court to conclude that the EPA Inspection Report or EPA Compliance Order are untrustworthy, and the Court has no reason to believe that they are untrustworthy.[7]  Therefore, Stabl's objections to the EPA Inspection Report and the EPA Compliance Order will be overruled.

## II.  The Supplemental Motion to Strike

In the Supplemental Motion to Strike, Stabl requests that the Court strike the following paragraphs of the Reply Declaration and exhibits:

1. Paragraph 2 and exhibit 24 (Filing No. 69-1), which consists of NDEQ reports Lexington prepared;

2. Paragraphs 4 and 5 and exhibit 26 (Filing Nos. 69-3 through 69-8, 70-1, 70-2), which consists of Lexington's DMRs;

3. Paragraph 9 and exhibit 30, which is the Supplemental Declaration of Plaintiffs' expert, Mark J. Klingenstein, P.E.;

4. Paragraph 10 and exhibit 31, which is the Declaration of Paul Marshall, P.E.;

5. Paragraph 11 and exhibit 32, which is the Declaration of Joe Pepplitsch, and exhibit 6 referenced therein; and

6. Paragraphs 15 and 16 and exhibits 36 and 37 (Filing Nos. 70-12, 70-13), which are letters dated September 23, 2009 (the "September Letter"), and November 23, 2009 (the "November Letter"), from Thomas T. Satchell of Jacobson Satchell Consultants, to Robert Bryant of the Water Enforcement Branch of the EPA.

The Court will address each objection in turn, and notes that, to the extent any one has merit, the Court will not consider the inadmissible exhibit when ruling on the Summary Judgment Motion.  Striking the exhibit is unnecessary.

---

[7] The Court notes that Fagot testified that he and others from Stabl participated in the EPA's inspection.  (*See* Dep. of Jason Fagot, Filing No. 70-9 at 78:2-80:9.)

### A.    Paragraph 2 and the NDEQ Reports (Ex. 24)

With respect to paragraph 1 of the Supplemental Motion to Strike, Stabl contends that the NDEQ Reports should be stricken because they are "hearsay and hearsay within hearsay."  (Def.'s Br., Filing No. 88 at 2 ¶ 2.)  Stabl argues that the NDEQ reports are not admissions against Stabl, and Loyd cannot lay any foundation for the information contained within them because she did not prepare or participate in their preparation.  The Plaintiffs have not opposed Stabl's objections.  Therefore, Stabl's objection to the NDEQ Reports will be sustained, and the Court will not consider them when ruling on the Plaintiffs' Summary Judgment Motion.

### B.    Paragraphs 4 & 5 and Lexington's DMRs (Ex. 26)

With respect to paragraph 2 of the Supplemental Motion to Strike, Stabl contends that Lexington's DMRs should be stricken because they "are hearsay and contain hearsay within hearsay."  (Filing No. 88 at 2 ¶ 3.)  Stabl also asserts that foundation is lacking for their admission, and that the results contained within Lexington's DMRs are inaccurate and unreliable.  (*Id.*)  The Plaintiffs argue in their Reply Brief that Lexington's DMRs are admissible public documents.  (Filing No. 68 at CM/ECF p. 10.)

As a NPDES permit holder, Lexington had a legal duty to collect and report the information contained in its DMRs,[8] and Stabl has failed to point to evidence sufficient to show that the Lexington's DMRs are untrustworthy, *see* Fed. R. Evid. 803(8), or to satisfy its heavy burden of showing that they are inaccurate and unreliable.  *See Yates Indus.*, 757 F. Supp. at 447.  Therefore, Stabl's objection to Lexington's DMRs will be overruled, and paragraph 3 of the Supplemental Motion to Strike will be denied.

---

[8] *See* 40 U.S.C. § 1318(a), (c); 40 C.F.R. §§ 122.2(a), 122.41, 122.48.

**C.      Paragraph 9 and Klingenstein's Supplemental Declaration (Ex. 30)**

With respect to paragraph 3 of the Supplemental Motion to Strike, Stabl contends

Klingenstein's Supplemental Declaration should be stricken as an untimely attempt to

offer an undisclosed expert witness opinion and report.  The Plaintiffs note that motions

in limine challenging the admissibility of expert testimony under Fed. R. 702, *Daubert*,

and *Kumho*, were due by January 18, 2013 (Filing No. 42 at 3 ¶ 5.a.), and the first time

Stabl challenged Klingenstein's qualifications was in its brief opposing the Summary

Judgment Motion, which Stabl filed on March 1, 2013.  The Plaintiffs argue that the

Court may consider Klingenstein's Supplemental Declaration when ruling on their

Summary Judgment Motion because submitting the Supplemental Declaration was not

necessary until Stabl belatedly challenged Klingenstein's qualifications and the reliability

of his report, and it does nothing more than respond to Stabl's challenges.

Fed. R. Civ. P. 37(c)(1) states:

> If a party fails to provide information or identify a witness as required by
> Rule 26(a) or (e), the party is not allowed to use that information or
> witness to supply evidence on a motion, at a hearing, or at a trial, unless
> the failure was substantially justified or is harmless.

Under the present circumstances, to the extent the Plaintiffs should have

provided the information contained in Klingenstein's Supplemental Declaration earlier,

the Plaintiffs' have shown their failure to do so was substantially justified and is

harmless.  The matters Klingenstein addressed in his Supplemental Declaration are

made in response to the allegations and issues Stabl raised for the first time in its brief

opposing the Summary Judgment Motion, and nothing causes the Court to believe Stabl

has suffered from surprise or prejudice because of Klingenstein's Supplemental Declaration. Therefore, Stabl's objection to Klingenstein's Supplemental Declaration will be overruled, and paragraph 4 of the Supplemental Motion to Strike will be denied.

### D.   Paragraph 10 and Paul Marshall's Declaration (Ex. 31)

With respect to paragraph 4 of the Supplemental Motion to Strike, Stabl contends Marshall's declaration should be stricken because it was not previously listed as an expert report and Marshall was not listed as an expert witness. Stabl argues, therefore, Marshall's declaration "is another attempt to submit additional and/or supplemental expert testimony beyond the times set forth in the progression order." (Filing No. 88 at CM/ECF p. 3 ¶ 5.) In its Reply Brief, the Plaintiffs point to Marshall's declaration to rebut Stabl's claim that the data in the DMR reports are inaccurate and to counter Stabl's attack on Klingenstein's qualifications as an expert. (Filing No. 68 at CM/ECF p. 14, 16, 21 n.8.) The Plaintiffs also point to Marshall's report to lay foundation for, and establish the authenticity of, the Report. (*Id.* at p. 24-25, 27.)

Stabl does not appear to object to Marshall's declaration to the extent it is offered to lay foundation for and establish the authenticity of the Report. Therefore, Stabl's objection to Marshall's declaration will be overruled to the extent Marshall's declaration is offered for that purpose. To the extent Marshall presents expert opinions in his declaration, however, nothing indicates the failure to timely disclose his opinions was substantially justified or is harmless. *See* Fed. R. Civ. P. 37(c). *See also R.C. Olmstead, Inc., v. CU Interface, LLC*, 606 F.3d 262, 272 (6th Cir. 2010) ("The burden is on the potentially sanctioned party to prove harmlessness."); *Thurber v. Nebraska*, No. 4:06CV3174, 2008 WL 704211 (D. Neb. Mar. 7, 2008) ("The burden of establishing

substantial justification and harmlessness is upon the party who is claimed to have failed to make the required disclosure."). Furthermore, it appears that Marshall's declaration is unnecessary to the extent it has been presented to rebut Stabl's claim that the data in the DMR reports are inaccurate and to counter Stabl's attack on Klingenstein's qualifications as an expert. *See Am. Med. Sys., Inc. v. Laser Peripherals, LLC*, 712 F. Supp. 2d 885, 894 (D. Minn. 2010) (citing *Wegener v. Johnson,* 527 F.3d 687, 692 (8th Cir.2008)) ("When fashioning a remedy for untimely disclosure, a court should consider" among other factors, "the importance of the information or testimony."). Therefore, Stabl's objection to Marshall's declaration on the basis that it contains untimely disclosed expert reports will be sustained, and the Court will not consider any expert opinions contained in Marshall's declaration when ruling on the Plaintiffs' Summary Judgment Motion.

### E.      Paragraph 11 and Joe Pepplitsch's Declaration (Ex. 32)

In paragraph 5 of the Supplemental Motion to Strike, although Stabl states that it objects to Pepplitsch's declaration, the basis for Stabl's objection is that the Report, which is referenced in Pepplitsch's declaration, "contains factual, scientific, and supposedly expert statements and opinions." (Filing No. 88 at 3 ¶ 6.) Stabl contends, therefore, that the Report "cannot be entered into evidence by a supposed business record exception to the hearsay rule because there is no basis for reliability, accuracy, or foundation for the contents of the exhibit." (*Id.*)

The business records exception to the rule against hearsay states that it excepts from the rule against hearsay records of "an . . . opinion" if the foundational elements of the exception are satisfied, *see* Fed. R. Evid. 803(6), and the Eighth Circuit has

indicated that "laboratory test reports constitute business records and therefore are admissible subject to the requirements of Fed. R. Evid. 803(6)." *Shelton v. Consumer Prods. Safety Comm'n*, 277 F.3d 998, 1010 (8th Cir. 2002). As the Court noted previously, the requirements of Fed. R. Evid. 803(6) are satisfied with respect to the Report. Therefore, Stabl's objection to Pepplitsch's Declaration and the Report are overruled, and paragraph 5 of the Supplemental Motion to Strike will be denied.

F. **Paragraphs 15 and 16 and the Letters from Jacobson Satchell Consultants to the EPA (Exs. 36 & 37)**

In paragraph 6 of the Supplemental Motion to Strike, Stabl objects to the September Letter and the November Letter, acknowledging that they were sent and received, but contending that they are inadmissible because they are "hearsay and hearsay within hearsay and also lack foundation." (Filing No. 88 at 3 ¶ 7.)

It appears from the Plaintiffs' Reply Brief that the Plaintiffs have submitted the September Letter solely for the purpose of establishing that the EPA received the Compliance Plan from Jacobson Satchell Consultants. (*See* Filing No. 68 at CM/ECF p. 17-18.) The September Letter states: "Please find the enclosed Compliance Plan . . . for Nebraska By-Products, Inc. . . . . The [Compliance] Plan addresses the non-compliance of the facility's Nebraska Pretreatment Program Permit." (Filing No. 70-12.) It appears from the Plaintiffs' Reply Brief that the Plaintiffs have submitted the November Letter and its attachment, titled "Response to EPA Letter of October 22, 2009," to rebut Stabl's contention that data contained in the DMRs is inaccurate and unreliable. (Filing No. 68 at CM/ECF p. 12, 16.)

16

The Court will sustain Stabl's objections to the September Letter and the November Letter, and the Court will not consider these letters when ruling on the Plaintiffs' Summary Judgment Motion.  The Court notes that the Plaintiffs have pointed to other evidence indicating the EPA received the Compliance Plan from Jacobson Satchell Consultants, (*see* Filing No. 70-5 at 82:17-20), and that Stabl has failed to meet its "heavy burden" of showing that reporting inaccuracies are present in the DMRs.  *See Yates Indus., Inc.*, 757 F. Supp. at 447.

## FACTUAL BACKGROUND

Having considered Stabl's evidentiary objections, the following facts are those that are stated in the parties' briefs and supported by pinpoint citations to admissible evidence in the record, that the parties have admitted, and that the parties have not properly resisted as required by NECivR 56.1[9] and Fed. R. Civ. P. 56.

Stabl is a Nebraska corporation, originally incorporated as Nebraska By-Products, Inc.,[10] on March 23, 1979, and is a "person," as defined by 33 U.S.C. § 1362(5) and Neb. Rev. Stat. § 81-1502(10).  It owned and operated a beef rendering plant located in Lexington, Nebraska (the "Facility"), from about October 18, 1995, to May 28, 2010, when it sold the Facility.  It discharged wastewater from the Facility

---

[9]

Each material fact in the response must . . . include pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies, . . . .  Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.

NECivR 56.1(b)(1).

[10] The Court will refer to the Defendant as "Stabl," whether it was known at the specific time referenced as Nebraska By-Products, Inc., or as Stabl.

throughout that period to a Publicly Owned Treatment Works ("POTW"),[11] a wastewater treatment plant owned and operated by the City of Lexington ("Lexington"). The Compliance Plan states:

> There are two major sources of wastewater from the [Facility]. The first waste st[r]eam consists of all of the material that is generated during the processing of the products and cleanup operations. This material is high in oil and grease and biochemical oxygen demand (BOD). Pretreatment operations of this waste stream consists of the material passing through a dissolved air flotation (DAF) unit and pumped to an equalization tank.
>
> The second waste stream is the condensate water from the cooking operation. This stream is high in ammonia and oil and grease. The suspended solids are relatively low. This waste stream has no pretreatment, and is pumped directly to an on-site 125,000-gallon equalization tank. The combined flow in the equalization tank is then discharged to the City of Lexington wastewater treatment facility (WWTF).

(Filing No. 61-3 at CM/ECF 4-5.)

On October 1, 2004, the State of Nebraska, pursuant to EPA authorization, issued to Lexington a NPDES permit, Permit No. NE0042668 (the "NPDES Permit"). The NPDES Permit expired on September 30, 2009, but was administratively extended until another one issued in 2011. Lexington's NPDES Permit restricts the POTW's operations with respect to final effluent limitations[12] on carbonaceous biochemical oxygen demand ("CBOD"), total suspended solids ("TSS"), ammonia, and fecal coliform. CBOD is a subset of BOD, and like BOD, is a measure of oxygen required by bacteria to breakdown organic materials.

---

[11] The parties do not dispute that Lexington's POTW is a "POTW" as the term is defined under 40 C.F.R. §§ 122.2 and 403.3.

[12] The CWA defines the term "effluent limitation" as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources into navigable waters, the waters of the contiguous zone, or the ocean, including schedules of compliance." 33 U.S.C. § 1362(11).

Between May 1, 2006, and May 28, 2010, Stabl was an industrial user of Lexington's POTW.  Using a conservative approach,[13] the Report reflects Lexington's POTW could treat from its industrial users, on a monthly basis, peak wastewater loadings of 2,436[14] pounds per day for BOD, 1,980 pounds per day for TSS, and 362 pounds per day for ammonia; and on a daily basis, 5,656 per day for BOD, 4,506 per day for TSS, and 536 per day for ammonia.  (*See* Filing No. 61-5 ¶¶ 16, 27-28, 30-31; *see also* Filing No. 61-6 at CM/ECF p. 10 table 3.5.)  Sampling information revealed that, on different occasions from May 2006 through March 2008, the Facility discharged effluent in excess of those amounts for BOD, TSS, and ammonia, and that Lexington violated the NPDES Permit for the same parameters on those occasions.  (Filing No. 61-15; Filing Nos. 69-3 through 69-8, 70-1, 70-2; Filing No. 61-5, tables 1 & 2; Filing No. 61-8.)

From February 26 through February 28, 2008, the EPA conducted an inspection of the Facility.  (Filing No. 61-15.)  An EPA representative met with Fagot and Stabl's owner, Leon Johnson, during the course of the investigation.  (*See id.* at CM/ECF p. 1, 2; *see also* Filing No. 70-9 at 78:2-80:9.)  The EPA concluded that "[s]ince the startup of

---

[13] Klingenstein stated in his original declaration that:

[The] EPA utilized a conservative approach.  In particular, rather than simply apply the load allocation listed in paragraph 17 for the pretreated industrial influent (i.e., 1,792 lb/d for BOD), EPA assumed that the available industrial loading capacity was the composite influent load, minus the average domestic influent load.  For BOD, EPA assumed that peak day capacity was 8,231 lb/d – 2,575 lb/d = 5,656 lb/d rather than the 1,792 lb/d that it appears was assumed by [Lexington]'s engineers.  As such, EPA's approach is clearly very conservative.

(Decl. of Mark J. Klingenstein, P.E., Filing No. 61-5 ¶ 28.)

[14] The Court notes that using the "conservative approach" to calculate the peak, monthly-basis wastewater loading for BOD seems to actually result in a monthly-basis, peak wastewater loading  of 2,437, not 2436, pounds per day for BOD (5012 – 2575 = 2437).

the current [Stabl] facility about 5 years ago, periods of elevated oil and grease loading and organic loading have routinely impacted the Lexington [POTW]"; that the Facility was "the source of approximately half of the current organic loading to [Lexington's POTW] and more than half of the nitrogen loading"; and that "[a]verage ammonia discharges from [Stabl] over the last 2 years are *double* the proposed (average weekly) limit for ammonia. (The limit would have been exceeded in 87 of the last 102 weeks, had it been in effect)." (*Id.* at CM/ECF p. 10.) On July 8, 2009, the EPA issued to Stabl a "Notice of Violation" (Filing No. 61-17) indicating, among other violations,[15] that Stabl discharged pollutants that caused interference with Lexington's POTW. On July 28, 2009, the EPA issued to Stabl the Compliance Order.

On March 6, 2008, the State of Nebraska issued to Stabl a Nebraska Pretreatment Program permit (the "NPP Permit") (Filing No. 61-7), which had an effective date of April 1, 2008. The NPP Permit required Stabl to monitor and report, by submitting DMRs to the NDEQ and Lexington, ammonia, BOD, oil and grease, and TSS. For those parameters, the NPP Permit established the following effluent limitations: (1) for ammonia, a weekly average limit of 95 kilograms per day and a daily maximum limit of 200 kilograms per day; (2) for BOD, a weekly average limit of 995 kilograms per day and a daily maximum limit of 1420 kilograms per day; (3) for oil and grease, a weekly average limit of 190 kilograms per day and a daily maximum limit 284 kilograms per day; and (4) for TSS, a weekly average limit of 948 kilograms per day and a daily maximum limit of 1,895 kilograms per day. (*Id.* at CM/ECF p. 4.)

---

[15] These other violations related to failing to submit and retain DMRs.

20

From April 2008 to May 2010, the Facility's discharge exceeded those effluent limitations, as follows: (1) for ammonia, the Facility exceeded the weekly average limit 90 times and the daily maximum limit 76 times; (2) for BOD, the Facility exceeded the weekly average limit 76 times and the daily maximum limit 67 times; (3) for oil and grease, the Facility exceeded the weekly average limit 21 times and the daily maximum limit 44 times; and (4) for TSS, the Facility exceeded the weekly average limit 23 times and the daily maximum limit 12 times.  (*See* Filing No. 61-8; *see also* Klingenstein Decl., Filing No. 61-5, table 2.)  From April 2008 through July 2009, Stabl did not report on its DMRs the value for the total oil and grease loading.[16]  (*See* Filing No. 61-8.)

On four or five occasions, Lexington had to shut down the POTW because of oil and grease entering the POTW.  (Dep. of Dennis Sund, Filing No. 61-13 at 25:17-22.)  It would take approximately two days each time to clean the POTW.  (*Id.* at 26:3-13.)  When the grease and oil caused Lexington's POTW to shut down, someone from Lexington's POTW would contact someone from Stabl (Filing No. 61-11 at 51:15-17, 52:2-5), and on at least one of those four or five occasions, individuals employed by Stabl went to the POTW to help remove the grease.  (Filing No. 61-13 at 26:16-20, 27:7-17; Filing No. 61-11 at 52:6-13; Dep. of Jess Bliven, Filing No. 61-12 at 42:8-17.)

The Plaintiffs filed their Complaint (Filing No. 1) on August 10, 2011, alleging: (1) that the Facility's discharges of pollutants to Lexington's POTW, alone or in conjunction with the discharge(s) from other sources, caused Lexington to violate its NPDES permit ("Interference and/or Pass Through Claim"), in violation of 33 U.S.C. §§ 1311 and 1317, 40 C.F.R. § 403.5, Neb. Rev. Stat. § 81-1506(2)(d), and Nebraska Administrative Code

---

[16] The Court notes that Stabl's March 2009 DMR reflects that a measurement for oil and grease may have been reported.  (Filing No. 61-8 at CM/ECF p. 12.)

("NAC") Title 119, Chapter 26-002.01; (2) that, in violation of 33 U.S.C. §§ 1311 and 1317, the regulations found in Title 40, Part 403, of the Code of Federal Regulations, Neb. Rev. Stat. § 81-1508.02(1)(b), and NAC Title 119, (a) the Facility discharged ammonia, BOD, and TSS in excess of the limits set forth in the NPP Permit ("Pretreatment Effluent Limit Violation Claim"), and (b) that the Facility failed to sample for oil and grease as required by the NPP Permit ("Pretreatment Permit Sampling Violation Claim"); and that (3) Stabl improperly abandoned three lagoons into which it discharged wastewater ("Abandonment Claim"), in violation of Neb. Rev. Stat. § 81-1508.02 and NAC Title 123, Chapter 10, § 004.   The Plaintiffs' Summary Judgment Motion only addresses the issue of liability, and addresses all of the Plaintiffs' claims except for its Abandonment Claim.

## SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate when the record, viewed in the light most favorable to the non-moving party, demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."   *Gage v. HSM Elec. Prot. Serv., Inc.,* 655 F.3d 821, 825 (8th Cir. 2011) (citing Fed. R. Civ. P. 56(c)). The court will view "all facts in the light most favorable to the non-moving party and mak[e] all reasonable inferences in [that party's] favor."   *Schmidt v. Des Moines Pub. Sch.*, 655 F.3d 811, 819 (8th Cir. 2011).   However, "'facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts.'"   *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) (quoting *Scott v. Harris,* 550 U.S. 372, 380 (2007)).   "If the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence . . . that would entitle it to a directed

verdict if not controverted at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986). In response to the movant's showing, the nonmoving party's burden is to produce "evidentiary materials that demonstrate the existence of a 'genuine issue' for trial." *Id.*

In other words, where the Court finds that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party"–where there is no "'genuine issue for trial'"–summary judgment is appropriate. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253, 289 (1968)).

## DISCUSSION

The Plaintiffs contend that they have pointed to sufficient admissible evidence to show Stabl is liable as a matter of law with respect to their Interference and/or Pass Through Claim, their Pretreatment Effluent Limit Violation Claim, and their Pretreatment Permit Sampling Violation Claim. Stabl contests the Plaintiffs' motion, arguing only that the evidence the Plaintiffs rely upon to support their claims is inadmissible.

Congress enacted the CWA[17] "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters," and declared that "it is [a] national goal that the discharge of pollutants into navigable waters be eliminated[.]" 33 U.S.C. § 1251(a)(1). The CWA "forbids the 'discharge of any pollutant'—defined as the 'addition of any pollutant to navigable waters from any point source'—unless executed in

---

[17] The Court notes the Plaintiffs bring each of their claims under both the CWA and the NEPA. The parties do not address whether the Plaintiffs claims differ depending on the source of the claim, and they point only to federal case law to support their arguments. For purposes of the present motions, the Court will assume that, regardless of whether a claim is brought pursuant to the CWA or NEPA, what the Plaintiffs must prove to establish Stabl's liability is the same. The Nebraska Supreme Court has indicated it would look to the CWA, "the source of many of the provisions found in [the NEPA]," to guide its interpretation of the NEPA. *State ex rel. Wood v. Fisher Foods, Ltd.*, 581 N.W.2d 409, 415 (Neb. 1998).

compliance with the [CWA]'s provisions." *Iowa League of Cities v. E.P.A.*, 711 F.3d 844, 855 (8th Cir. 2013) (quoting 33 U.S.C. §§ 1311(a), 1362(12)).[18] "Civil liability under the Clean Water Act is strict," *United States v. Bailey*, 571 F.3d 791, 805 (8th Cir. 2009), and is "not determined by whether the discharge has an adverse effect on the environment." *CPS Chem. Co.*, 779 F. Supp. at 450.

When the CWA is violated, the EPA may issue a "finding of violation" and a "compliance order," or it may commence a civil action "for appropriate relief." 33 U.S.C. § 1319(a), (b).  "Appropriate relief" under the CWA includes "a permanent or temporary injunction," as well as "a civil penalty not to exceed $25,000 per day for each violation."[19] *Id.* at § 1319(b), (d).[20]

---

[18] "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any *person* shall be unlawful."  33 U.S.C. § 1311(a) (emphasis added).  As the Court noted previously, there is no dispute that Stabl is a "person," *see* 33 U.S.C. § 1362(5), under the CWA.

[19] The CWA treats "a single operational upset which leads to simultaneous violations of more than one pollutant parameter . . . as a single violation."  33 U.S.C. § 1319(d).

The Court also notes that the NEPA subjects "a person to a civil penalty of no more than ten thousand dollars per day. In case of a continuing violation, each day shall constitute a separate offense."  Neb. Rev. Stat. § 81-1508.02(2).

[20] The CWA sets out six factors for a court to consider when determining the amount of a civil penalty:

> [1] the seriousness of the violation or violations, [2] the economic benefit (if any) resulting from the violation, [3] any history of such violations, [4] any good-faith efforts to comply with the applicable requirements, [5] the economic impact of the penalty on the violator, and [6] such other matters as justice may require.

33 U.S.C. § 1319(d).  While these factors are designed to give courts direction when fashioning penalties for CWA violations, a court has "wide discretion" when deciding the penalty that should be imposed. *United States v. Smithfield Foods, Inc.*, 191 F.3d 516, 526 (4th Cir. 1999).

Similar to the CWA, the NEPA states: "In assessing the amount of the fine, the court shall consider the degree and extent of the violation, the size of the operation, and any economic benefit derived from noncompliance."  Neb. Rev. Stat. § 81-1508.02(2).

One provision of the CWA provides for the NPDES, which is a permit program that "plays a central role in federal authorization of permissible discharges."  *Iowa League of Cities*, 711 F.3d at 855 (citing 33 U.S.C. § 1342).  "The NPDES is the linchpin of the Act, for it transforms generally applicable effluent limitations into the individual obligations of each discharger."  *Coeur Alaska, Inc. v. Se. Alaska Conservation Council*, 557 U.S. 261, 300 (2009) (citing *E.P.A. v. Cal. ex rel. State Water Res. Control Bd.*, 426 U.S. 200, 205 (1976)).  The CWA authorizes the EPA to issue NPDES permits, and states may "administer their own NPDES programs" so long as they obtain the EPA's authorization and "ensure that . . . discharge permits [are issued] in accord with the same federal rules that governs permits issued by the EPA."  *Iowa League of Cities*, 711 F.3d at 855 (citing 33 U.S.C. § 1342(a); 40 C.F.R. 122.41).  Industrial users that discharge pollutants to POTWs are not required to obtain individual NPDES permits. Instead, they must comply with "pretreatment" programs the POTW establishes which set forth, often in the form of pretreatment permits, the requirements those industrial users must follow.  *See* 33 U.S.C. § 1342(b)(8).  *See also id.* at § 1317; 40 C.F.R. § 403.1 *et seq.*; *Student Pub. Interest Research Grp. of N.J., Inc. v. P.D. Oil & Chem. Storage, Inc.*, 627 F. Supp. 1074, 1090 (D.N.J. 1986).

The Court discusses the three claims addressed in the Plaintiffs' Summary Judgment Motion in the order they are presented in the parties' briefs.

## I. Pretreatment Effluent Limit Violation Claim

"Where specific prohibitions or limits on pollutants or pollutant parameters are developed by a POTW," 40 C.F.R. § 403.5(d), "it shall be unlawful for any owner or operator of any source to operate any source in violation of any such . . . pretreatment

25

standard." 33 U.S.C. § 1317(d).  *See also P.D. Oil & Chem. Storage*, 627 F. Supp. at 1090 ("[T]he law is clear that a discharger whose effluent exceeds its permit limitations and who does not have a valid defense to the violation violates the Act.").  In other words, to establish their Pretreatment Effluent Limit Violation Claim, the Plaintiffs must prove Stabl discharged effluent in excess of the limits set forth in its NPP Permit.

The uncontroverted evidence in the record reflects that the amount of ammonia, BOD, oil and grease, and TSS discharged from the Facility exceeded the limits set forth in the NPP Permit.  Specifically, uncontroverted evidence in the record reveals that the Facility exceeded its daily maximum limit 76 times for ammonia, 67 times for BOD, 44 times for oil and grease, and 12 times for TSS; and that the Facility exceed its weekly average limit 90 times for ammonia, 76 times for BOD, 21 times for oil and grease, and 23 times for TSS.  Therefore, the Plaintiffs' Summary Judgment Motion will be granted with respect to liability on the Plaintiff's Pretreatment Effluent Limit Violation Claim.  *See CPS Chem. Co.*, 779 F. Supp. at 443 ("[C]ourts have granted summary judgment on the issue of liability based on a reading of a defendant's DMRs.").

The Plaintiffs contend that each time Stabl violated a weekly average limit, Stabl committed a violation for each day of the week in question.  Thus, the Plaintiffs argue that Stabl engaged in a total of 1669 violations of the NPP Permit's effluent limitations-- 169 violations of daily maximum limit violations plus the equivalent of 1470 daily violations resulting from the 630 violations of the weekly average limitations (1 violation of the weekly average limit equaling 7 daily violations).  Stabl has not addressed this issue, and the Plaintiffs' calculations appear to be consistent with how the Eighth Circuit would calculate the total number of violations committed.  *See E.P.A. v. City of Green*

26

*Forest, Ark.*, 921 F.2d 1394, 1407 (8th Cir. 1990) ("We agree with the majority of the courts that have addressed the issue that violation of a monthly average effluent should be counted as thirty separate violations.").   The issue of the total number of violations committed, however, is intertwined with the issue of the appropriate penalties the Court may award pursuant to 33 U.S.C. § 1319(d).   Therefore, at this time, the Court will not rule on the exact number of violations committed.[21]

## II. Pretreatment Permit Sampling Violation Claim

CWA regulations state that a POTW pretreatment program is required to control the industrial user's contribution to the POTW through "[s]elf-monitoring, sampling, reporting, notification and recordkeeping requirements[.]"   40 C.F.R. § 403.8(f)(1)(iii)(B)(4).   Uncontroverted evidence in the record reflects that the NPP Permit required Stabl to take and report weekly oil and grease samples and report the results in its DMRs, but that Stabl did not report on its DMRs any value for oil and grease from April 2008 through July 2009, except possibly March 2009.   Stabl has not pointed to any evidence in the record from which it may reasonably be inferred that other records of grease and oil sampling exist.   Therefore, the Plaintiffs' Summary Judgment Motion will

---

[21] *See Inland Empire Waterkeeper v. Uniweb, Inc.*, No. EDCV07-00480DDP FMOX, 2008 WL 6098645, at *10 (C.D. Cal. Aug. 6, 2008):

> Courts have found that "where a violation is defined in terms of a time period longer than a day, the maximum penalty assessable for that violation should be defined in terms of the number of days in that time period." *Chesapeake Bay Found. v. Gwaltney of Smithfield,* 791 F.2d 304, 314 (4th Cir.1986), *vacated on other grounds, Gwaltney v. Smithfield, Ltd.,* 484 U.S. 49 (1987); *see also United States v. Allegheny Ludlum Corp.,* 366 F.3d 164, 188 (3rd Cir.2004). The Court accepts this proposition as a statement of the law. However, the Court defers ruling on the precise number of Uniweb's violations. That issue is interrelated with the Court's discretionary assessment of appropriate civil penalties. *See* 33 U.S.C. § 1319(d). The parties are yet to provide briefing or evidence on civil penalties. The Court, therefore, considers it prudent to rule on the precise number of Uniweb's violations in conjunction with its discretionary determination of the appropriate civil penalties.

be granted with respect to the issue of liability on the Plaintiffs' Pretreatment Permit Sampling Violation Claim.  For the same reasons stated with respect to the Plaintiffs' Pretreatment Effluent Limit Violation Claim, at this time, the Court will not rule on the exact number of violations committed.

### III.  Interference and/or Pass Through Claim

"A User may not introduce into a POTW any pollutant(s) which cause Pass Through or Interference."   40 C.F.R. § 403.5(a)(1).   CWA regulations define "Interference" as:

> [A] Discharge which, alone or in conjunction with a discharge or discharges from other sources, both:
>
> (1) Inhibits or disrupts the POTW, its treatment processes or operations . . . ; and
>
> (2) Therefore is a cause of a violation of any requirement of the POTW's NPDES permit (including an increase in the magnitude or duration of a violation)[.]

40 C.F.R. § 403.3(k).  The regulations define "Pass Through" as:

> [A] Discharge which exits the POTW into waters of the United States in quantities or concentrations which, alone or in conjunction with a discharge or discharges from other sources, is a cause of a violation of any requirement of the POTW's NPDES permit (including an increase in the magnitude or duration of a violation).

40 C.F.R. § 403.3(p).

The CWA regulations also provide industrial users with affirmative defenses to claims of "Pass Through" and "Interference."  *See* 40 C.F.R. § 403.5(a)(2).  Specifically, the regulations state that the user may avoid CWA Interference or Pass Through liability if it can show:

 (i) It did not know or have reason to know that its Discharge, alone or in conjunction with a discharge or discharges from other sources, would cause Pass Through or Interference; and

(ii)(A) A local limit designed to prevent Pass Through and/or Interference, as the case may be, was developed . . . for each pollutant in the User's Discharge that caused Pass Through or Interference, and the User was in compliance with each such local limit directly prior to and during the Pass Through or Interference; or

> (B) If a local limit designed to prevent Pass Through and/or Interference, as the case may be, has not been developed . . . for the pollutant(s) that caused the Pass Through or Interference, the User's Discharge directly prior to and during the Pass Through or Interference did not change substantially in nature or constituents from the User's prior discharge activity when the POTW was regularly in compliance with the POTW's NPDES permit requirements[.]

40 C.F.R. § 403.5(a)(2). The user bears the burden of establishing its affirmative defense. *See City of Green Forest*, 921 F.2d at 1406; *Ark. Poultry Fed'n v. E.P.A.*, 852 F.2d 324, 328 (8th Cir. 1988).

In other words, to establish its Interference and/or Pass Through Claim, the Plaintiffs must show that Stabl discharged pollutants to Lexington's POTW that caused, alone or in conjunction with a discharge or discharges from other sources, Lexington's POTW to violate the NPDES Permit.[22] Stabl may then attempt to escape liability by pointing to evidence that tends to establish "either the 'local limit compliance' or the 'unchanged discharge' affirmative defense," *id.* at 328 (citing 40 C.F.R. § 403.5(a)(2)(ii)(A), (B)), both requiring that Stabl not be on notice that its discharge would cause "Pass Through" or "Interference."

The parties do not dispute that, from about October 18, 1995, to May 28, 2010, Stable discharged wastewater to Lexington's POTW, and uncontroverted evidence in

---

[22] It appears that whether the discharge is considered "Interference" or "Pass Through" relates only to the means by which Stabl's discharge may have caused a violation of the NPDES Permit.

the record reflects that on different occasions from May 2006 through March 2008, Stabl discharged from the Facility BOD, TSS, and ammonia in amounts greater than Lexington's POTW was capable of treating, and, that on those occasions, Lexington violated the NPDES Permit for those same parameters.  Furthermore, uncontroverted evidence in the record reflects that, on approximately four or five occasions, pollutants Stabl discharged from the Facility caused Lexington to shut down its operations for two days at a time.  Stabl has not pointed to any evidence tending to support either the "local limit compliance" or the "unchanged discharge" defense.  Finally, the Plaintiffs have pointed to evidence tending to show Stabl at least "had reason to know" that its discharges to Lexington's POTW caused "Pass Through" and/or "Interference."  (*See* Filing No. 61-11 at 51:15-17, 52:2-13; Filing No. 61-12 at 42:8-17; Filing No. 61-13 at 25:17-22, 26:3-25, 27:10-13.)

The uncontroverted facts summarized above are sufficient to establish the Plaintiffs' claim that Stabl's discharges caused "Interference" and/or "Pass Through," and Stabl has failed to point to evidence sufficient to establish an affirmative defense. Therefore, the Plaintiffs' Summary Judgment Motion will be granted with respect to liability on the Plaintiff's Interference and/or Pass Through Claim.  For the same reasons stated with respect to the Plaintiffs' Pretreatment Effluent Limit Violation Claim and Pretreatment Permit Sampling Violation Claim, at this time, the Court will not rule on the exact number of violations committed.

## CONCLUSION

The Original Motion to Strike will be denied as moot, and the Supplemental Motion to Strike will be granted in part, however, none of the exhibits need be stricken

from the record.   To the extent an exhibit is not admissible, the Court has not considered it when ruling on the Plaintiffs' Summary Judgment Motion.   Having considered Stabl's evidentiary objections, the Court finds the Plaintiffs have satisfied their burden of pointing to admissible evidence sufficient to show Stabl is liable with respect to the Plaintiffs' Pretreatment Effluent Limit Violation Claim, Pretreatment Permit Sampling Violation Claim, and Interference and/or Pass Through Claim.   The number of violations that occurred with respect to each claim, however, will be addressed in conjunction with the Court's discretionary determination of the appropriate civil penalties that should be assessed.   Accordingly,

IT IS ORDERED:

1.      The Plaintiffs' Motion for Partial Summary Judgment on the Issue of Liability (Filing No. 59) is granted in part, as follows:

a.  The Plaintiffs have established that Defendant Stabl, Inc., is liable with respect to the following claims asserted in the Plaintiffs' Complaint (Filing No. 1):

i.  The Pretreatment Effluent Limit Violation Claim (*id.* ¶¶ 52-54);

ii.  The Pretreatment Permit Sampling Violation Claim (*id.* ¶¶ 55-57); and

iii.  The Interference and/or Pass Through Claim (*id.* ¶¶ 47-51); and

b.  The Motion is otherwise denied;

2.      The Motion to Strike (Filing No. 73) filed by Defendant Stabl, Inc., is denied as moot;

3.      The Supplemental Motion to Strike (Filing No. 87) filed by Defendant

Stabl, Inc., is granted in part, as follows:

a.   The following exhibits have been disregarded with respect to the

Plaintiffs' Motion for Summary Judgment on the Issue of Liability:

i.  Exhibit 24 (Filing No. 69-1);

ii.   To the extent it contains expert opinions, exhibit 31 (Filing No.

70-7); and

iii.  Exhibits 36 (Filing No. 70-12) and 37 (Filing No. 70-13); and

b.  The Motion is otherwise denied.


Dated this 21st day of May, 2013.

BY THE COURT:


s/Laurie Smith Camp
Chief United States District Judge