IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

UNITED STATES OF AMERICA and )
THE STATE OF NEBRASKA, )
)         CIVIL NO. 11-cv-00274-LSC-FG3
Plaintiffs, )
)
v. )
)
STABL, INC. (f/k/a Nebraska By-Products, Inc.), )
)
Defendant. )
)

**PLAINTIFFS' FINDINGS OF FACT**

## I.    MATTERS PREVIOUSLY DECIDED

1.      Stabl, Inc. (Stabl) is a Nebraska corporation, originally incorporated as Nebraska By-Products, Inc. on March 23, 1979.  Memorandum and Order, Docket No. 98 (hereinafter Docket No. 98) at 17.

2.      Stabl is a "person," as defined by 33 U.S.C. § 1362(5) and Neb. Rev. Stat. § 81-1502(10). Docket 98 at 17.

3.      Stabl owned and operated a beef rendering plant located in Lexington, Nebraska (the Facility), from about October 18, 1995, to May 28, 2010, when it sold the Facility.  Docket 98 at 17.

4.      Stabl discharged wastewater from the Facility throughout that period to a Publicly Owned Treatment Works (POTW), a wastewater treatment plant owned and operated by the City of Lexington (Lexington).  Docket 98 at 18.

5.      On October 1, 2004, the State of Nebraska, pursuant to EPA authorization, issued to Lexington a NPDES permit, Permit No. NE0042668 (the NPDES Permit). The NPDES Permit

expired on September 30, 2009, but was administratively extended until another one issued in 2011. Docket No. 98 at 18.

6.      Lexington's NPDES Permit restricts the POTW's operations with respect to final effluent limitations on carbonaceous biochemical oxygen demand (CBOD), total suspended solids (TSS), ammonia, and fecal coliform. CBOD is a subset of biochemical oxygen demand (BOD), and like BOD, is a measure of oxygen required by bacteria to breakdown organic materials. Docket No. 98 at 18.

7.      Between May 1, 2006, and May 28, 2010, Stabl was an industrial user of Lexington's POTW.  Docket No. 98 at 19.

8.      Using a conservative approach, Lexington's POTW could treat from its industrial users, on a monthly basis, peak wastewater loadings of 2,436 pounds per day for BOD, 1,980 pounds per day for TSS, and 362 pounds per day for ammonia; and on a daily basis, 5,656 per day for BOD, 4,506 per day for TSS, and 536 per day for ammonia. Docket No. 98 at 19.

9.      Sampling information revealed that, on different occasions from May 2006 through March 2008, the Facility discharged effluent in excess of those amounts for BOD, TSS, and ammonia, and that Lexington violated its NPDES Permit for the same parameters on those occasions.  Docket No. 98 at 19.

10.     From February 26 through February 28, 2008, the EPA conducted an inspection of the Facility.  An EPA representative met with Facility Manager Jason Fagot and Stabl's owner, Leon Johnson, during the course of the investigation.  Docket No. 98 at 19.

11.     The EPA concluded in its inspection report that "[s]ince the startup of the current [Stabl] facility about 5 years ago, periods of elevated oil and grease loading and organic loading have routinely impacted the Lexington [POTW]"; that the Facility was "the source of approximately

Pls.' Findings of Fact, pg. 2

half of the current organic loading to [Lexington's POTW] and more than half of the nitrogen loading"; and that "[a]verage ammonia discharges from [Stabl] over the last 2 years are double the proposed (average weekly) limit for ammonia. (The limit would have been exceeded in 87 of the last 102 weeks, had it been in effect)."  Docket No. 98 at 19-20.

12.     On July 8, 2009, the EPA issued to Stabl a "Notice of Violation" indicating, among other violations, that Stabl discharged pollutants that caused interference with Lexington's POTW. Docket No. 98 at 20.

13.     On July 28, 2009, the EPA issued to Stabl a Compliance Order.  Docket No. 98 at 20.

14.     On March 6, 2008, the State of Nebraska issued to Stabl a Nebraska Pretreatment Program permit (the NPP Permit), which had an effective date of April 1, 2008.  Docket No. 98 at 20.

15.     The NPP Permit required Stabl to monitor and report values for ammonia, BOD, oil and grease, and TSS, by submitting Discharge Monitoring Reports (DMRs) to the Nebraska Department of Environmental Quality (NDEQ).  Docket No. 98 at 20.

16.     For those parameters, the NPP Permit established the following effluent limitations: (1) for ammonia, a weekly average limit of 95 kilograms per day and a daily maximum limit of 200 kilograms per day; (2) for BOD, a weekly average limit of 995 kilograms per day and a daily maximum limit of 1420 kilograms per day; (3) for oil and grease, a weekly average limit of 190 kilograms per day and a daily maximum limit 284 kilograms per day; and (4) for TSS, a weekly average limit of 948 kilograms per day and a daily maximum limit of 1,895 kilograms per day. Docket No. 98 at 20.

17.     From April 2008 to May 2010, the Facility's discharge exceeded those effluent limitations, as follows: (1) for ammonia, the Facility exceeded the weekly average limit 90 times

Pls.' Findings of Fact, pg. 3

and the daily maximum limit 76 times; (2) for BOD, the Facility exceeded the weekly average limit 76 times and the daily maximum limit 67 times; (3) for oil and grease, the Facility exceeded the weekly average limit 21 times and the daily maximum limit 44 times; and (4) for TSS, the Facility exceeded the weekly average limit 23 times and the daily maximum limit 12 times. Docket No. 98 at 21, 26.

18.     The NPP Permit required Stabl to take and report weekly oil and grease samples and report the results in its DMRs, but Stabl did not report on its DMRs any value for oil and grease from April 2008 through July 2009, except possibly March 2009.  Docket No. 98 at 21, 27.

19.     On four or five occasions, Lexington had to shut down the POTW because of oil and grease entering the POTW.  It would take approximately two days each time to clean the POTW. Docket No. 98 at 21.

20.     When the grease and oil caused Lexington's POTW to shut down, someone from Lexington's POTW would contact someone from Stabl, and on at least one of those four or five occasions, individuals employed by Stabl went to the POTW to help remove the grease.  Docket No. 98 at 21.

21.     Stabl has not pointed to any evidence tending to support either the "local limit compliance" or the "unchanged discharge" defense.   Docket No. 98 at 30.

22.     Stabl at least "had reason to know" that its discharges to Lexington's POTW caused "Pass Through" and/or "Interference."  Docket No. 98 at 30.

Pls.' Findings of Fact, pg. 4

## II.    MATTERS FOR TRIAL

### A.    *Counting Violations*

23.    Stabl violated the daily maximum limitation for BOD of its NPP Permit on 67 daily equivalent violations.

24.    Stabl violated the weekly average limitation for BOD of its NPP Permit on 532 daily equivalent violations.

25.    Stabl violated the daily maximum limitation for ammonia of its NPP Permit on 76 daily equivalent violations.

26.    Stabl violated the weekly average limitation for ammonia of its NPP Permit on 630 daily equivalent violations.

27.    Stabl violated the daily maximum limitation for TSS of its NPP Permit on 12 daily equivalent violations.

28.    Stabl violated the weekly average limitation for TSS of its NPP Permit on 161 daily equivalent violations.

29.    Stabl violated the daily maximum limitation for oil and grease of its NPP Permit on 44 daily equivalent violations.

30.    Stabl violated the weekly average limitation for oil and grease of its NPP Permit on 147 daily equivalent violations.

31.    Stabl caused 307 daily equivalent violations at the Lexington POTW between August 2006 and April 2008, as a result of pass-through and interference.[1]

32.    Stabl failed to sample for daily maximum and weekly average limitations for oil and grease from April 1, 2008 to July 14, 2009.  Sixteen months (each containing four weeks) would result in at least 64 violations.

33.    Stabl is liable for a total of 2040 daily equivalent violations.

### B.    *Assessing a Penalty*

34.    Stabl was in frequent violation of the Clean Water Act and its Permit from at least August 2006 through May 2010.

35.    Stabl's violations were frequent and severe.  Stabl's wastewater concentrations were in many cases substantially over the limits for BOD, TSS, ammonia, and oil and grease in Stabl's NPP Permit and the limits of what the City POTW could treat.

36.    Between April 2008 and May 2010, Stabl's wastewater discharges violated its NPP Permit limits in 25 out of 26 months.  In each of these months, Stabl had at least 20, and sometimes as many as 140, daily equivalent violations.

37.    Each of Stabl's violations had potential toxic effects, whether the violation was of its NPP Permit or the restrictions against causing pass through and interference at the City POTW.

--------

[1] As Plaintiffs filed their Complaint on August 10, 2011, violations more than five years prior to this date could be barred under the statute of limitations found at 28 U.S.C. § 2462, which is the general federal statute of limitations.  Since the summary judgment stage, Plaintiffs have slightly altered the pass through and interference calculation to begin in August 2006, rather than May 2006.

Pls.' Findings of Fact, pg. 6

38.     Stabl made minor good faith efforts to comply with the applicable requirements.

39.     The City of Lexington POTW was inspected by the Nebraska Department of Environmental Quality numerous times including: October 2, 2002; July 4, 2004; July 11, 2006; August 15, 2006; November 14, 2006; and January 15, 2008.  These inspections discussed the compliance status of the City of Lexington POTW as well as the impact of its industrial users, particularly Stabl.

40.     On August 18, 2006, the NDEQ issued a notice of violation to the Defendant, noting Stabl's discharge was causing interference at the Lexington POTW.

41.     The NDEQ inspected the Facility on July 29, 2009.  Violations of the Clean Water Act were documented in this inspection.

42.     Stabl gained an economic benefit from its failure to fully comply with regulatory requirements relating to the Clean Water Act and its NPP Permit.

43.     The Compliance Plan, written by Jacobson Satchell Consultants, Inc. and submitted by Defendant to EPA, outlines the equipment Stabl proposed to install in order to come into compliance.  The Compliance Plan presented costs in a range of capital and one-time costs.

44.     The costs and time frames for Phase One of the Compliance Plan, estimated by Jacobson Satchell Consultants, Inc. and submitted by Defendant to EPA, are reasonable.

45.     Stabl did not construct the technology it proposed to install in the Compliance Plan.

46.     Stabl sold the Facility on May 28, 2010, while the Facility was still not in compliance with the Clean Water Act.

47.     Calculating economic benefit based on the technology Stabl proposed to install, using a reasonable assumption that a buyer would reduce the purchase price accordingly to account for the Facility's noncompliance, would result in an economic benefit enjoyed by Stabl of $667,770

Pls.' Findings of Fact, pg. 7

to $713,542 (in September 2013 dollars), presuming the Facility's buyer anticipated actual compliance by December 31, 2010.

48.      Calculating economic benefit based on the technology Stabl proposed to install, using a reasonable assumption that a buyer would reduce the purchase price accordingly to account for the Facility's noncompliance, would result in an economic benefit enjoyed by Stabl of $1,100,409 to $1,172,212 (in September 2013 dollars), presuming the Facility's buyer anticipated actual compliance by December 31, 2012.

49.      In fact, the Facility's buyer paid $1 million less to purchase the Facility in exchange for assuming the responsibility for building and operating the wastewater pre-treatment plant.  Stabl, in lieu of making compliance-related expenditures, accepted an actual loss of $1 million as a consequence of its noncompliance.

50.      Utilizing the facility sale date, May 28, 2010, in lieu of an hypothetical compliance date, using the reduction in purchase price to calculate economic benefit results in a range of $1,142,937 to $1,423,274 (in September 2013 dollars).

51.      The Facility was sold for $15.2 million on May 28, 2010.

52.      Stabl is no longer in operation.

Respectfully submitted,

Robert G. Dreher
Acting Assistant Attorney General
Environment & Natural Resources Division
United States Department of Justice

BY:  s/ Katherine A. Loyd
KATHERINE A. LOYD, MA #659518
Trial Attorney
United States Department of Justice
Environment and Natural Resources Division
Environmental Enforcement Section
999 18th Street, South Terrace, Suite 370

Denver, Colorado 80202
Telephone: (303) 844-1365
Facsimile: (303) 844-1350
kate.loyd@usdoj.gov
DANICA ANDERSON GLASER, DC #1005853
Trial Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, D.C. 20044-7611
Tel.: (202) 514-5270
Fax: (202) 616-2427
danica.glaser@usdoj.gov

DEBORAH R. GILG
United States Attorney
District of Nebraska

By: s/ Laurie A. Kelly
LAURIE A. KELLY
Assistant United States Attorney, Mass. Bar No.
557575
District of Nebraska
1620 Dodge Street, Suite 1400
Omaha, Nebraska 68102-1506
Telephone: (402) 661-3700
Fax: (402) 661-3081
laurie.kelly@usdoj.gov

JON BRUNING, #20351
Attorney General

BY:  s/ Katherine J. Spohn
Katherine J. Spohn, #22979
Deputy Attorney General
2115 State Capitol
Lincoln, NE  68508
(402) 471-2682
katie.spohn@nebraska.gov

CERTIFICATE OF SERVICE

I hereby certify that on September 10, 2013, the foregoing Findings of Fact were filed electronically with the Clerk of the Court to be served upon the CM/ECF registered counsel.

> BY:  s/ Katherine A. Loyd
> KATHERINE A. LOYD, MA #659518
> Trial Attorney
> United States Department of Justice
> Environment and Natural Resources Division
> Environmental Enforcement Section
> 999 18th Street, South Terrace, Suite 370
> Denver, Colorado 80202
> Telephone: (303) 844-1365
> Facsimile: (303) 844-1350

Pls.' Findings of Fact, pg. 10